May it please the Court, my name is Elisa Thomas and I represent the petitioner in this matter. At this point, I would like to reserve three minutes for rebuttal time. As recently as April 1st in Kaworu v. Holder, this Court has held that although the federal rules of evidence do not apply in administrative proceedings, there are limits on admissibility of evidence and that the test for admissibility includes fundamental fairness. In this case, we have the functional equivalent of secret evidence. Your Honor, this was a fundamentally flawed credibility determination. Let me tell you why. First of all, unconstitutional evidence was admitted. Exhibit 9, Monica Cooper's testimony, contained double hearsay. Her documents allowed in statements. Well, stop. You said unconstitutional. What's your constitutional issue? There was no due process. My client was not given a chance to cross-examine the witnesses against him. Well, yes. You began by saying that the rules don't actually apply in administrative hearings. The question is, is it fundamentally fair? So that's really what we're looking at. Right, right. And in Sedan, this Court has held that the government must make a reasonable effort in immigration proceedings to afford the alien a reasonable opportunity to confront the witnesses against him. In this case, Monica Cooper was the fraud investigator, and she went and she faxed one colonel, spoke to another colonel, who happened to have a personal vendetta against my client, and it's not so much Monica Cooper whose statements were authenticated. It's the people who specially prepared these letters and statements that they gave to Monica Cooper that I feel were fundamentally unfair to my client, because he never got a chance to say to ask Colonel Bariga any questions. Or when she went in and obtained a police report, they said that she went in 10 years after the fact, and it's not the records that were admitted. You know, we don't know what the source of those were. She, of the police report. He did have this information, though, very long in advance, right? He did have all this information very long in advance. Yes, Your Honor. Which information? All the documents with Cooper's report and the supporting documentation. Yes. Years in advance. Yes, that's true. So the first, with the first I.J. who eventually recused himself, that trial lasted a little short of 10 years. And it was at that trial where the evidence was admitted. So, yes, Your Honor's right. So he knew the evidence was there. Is there anything he could do to gather evidence on his side? Well, Your Honor, first of all, he wouldn't have access to the Peruvian. I guess the answer is no, because he wouldn't. Nobody really has access in that sense. One of the funny things about immigration cases is both sides are somewhat handicapped in what information they get access to, and the I.J.'s forced to make do with what they're put in front of them. And as you noted, the formal rules of evidence don't apply, so they kind of – everybody makes do. Well, why couldn't your client make do as well? Right. Well, all the more reason why it would have been where if an effort made to afford him a reasonable opportunity to cross the people making these statements, even if it were just the telephone. That means they had to appear in person? No. They could have made a telephonic appearance. And couldn't your client have tried to arrange for that? Had years of notice? Not in the record, no. Well, had years of notice. I mean, this evidence didn't come as a surprise. And the I.J. didn't have any power over the people in Peru, so the I.J. couldn't issue a subpoena to force them to show up personally or even to show up for a telephone  What were they supposed to do? Well, again, my client did strenuously object to the admission of that evidence. And did he try to go out and gather evidence that would have shown that his version of the story was correct? Well, the evidence that he did submit, the I.J. accorded absolutely no weight to, whereas the evidence – Well, accorded weight or didn't believe. Those are different things. Actually, according to the – he did no – he – sorry. He did not accord any weight to it, and that's in the administrative record on page 42. Which evidence is that? The police report that was submitted, Exhibit 5C. Because somebody else said it was a fraudulent report. Yes. And he – and how did the I.J. deal with this other evidence, with the Cooper evidence? He sort of at some point seemed to be saying he wasn't going to give it much weight, but then he did give it weight at other points. I guess what I really want to address is a prejudice question. Absolutely. The judge accorded substantial weight to the Cooper report, and that's on the administrative record on page 52. As a matter of fact, his whole credibility determination was based on this Exhibit 5. Counsel, can I just ask about this and the prejudice problem? Wasn't there substantial evidence to prove that he was giving inconsistent statements? He actually gave two different stories here. What is your response to that? I'm glad you asked that, Your Honor. Actually, it is not – he did not give any inconsistent statements. I think that's a factual error the I.J. made, because the I.J. said that, well, you can't be both threatened by the Shining Path guerrillas and have them try to recruit you. That's the inconsistency that the immigration judge found. But when you think about it, of course, the Sendero would first try and recruit you to see if they could get a spy within the Peruvian Air Force, and when that didn't work, then the threat started after he came back from Lima. Well, as I read the record, Counsel, in his initial application, he said he was alerted by his military friends that Shining Path members had discovered his name. And at the hearing, by contrast, he testified he'd met with Shining Path leaders multiple times while they attempted to recruit him, and that only after rejecting their recruitment efforts did they begin to threaten him. This is not a difference in details, or it's really two different stories. Well, the statements that you make are correct, Your Honor. I don't necessarily see that it would be two different stories. All of the details of his meeting with Falcón, the Sendero leader, show that all of his meetings with the Sendero leader and his statement that came after the asylum application were basically happened before all of the threats started. So the – sorry. It's simply more details being given to bolster the asylum application. Well, let me give you another example, and then I'll stop. Can you explain why your client did not mention the shooting of his brother-in-law in his initial application or supplemental declaration? Your Honor, I can't explain that, and then I would like to sit down for my rebuttal moments. The reason is that he stated himself in the record he did not know the process. He was not represented when he first filled out the asylum application, and – oh, I – and that's on the administrative record on page 17 of the report. And that's on page 483. And at this point – One question I have is, was the story about why the fact that they tried to recruit him originally, it wasn't a supplemental declaration, was that before the hearing? Yes, it was. I see. So it wasn't any change to that at the hearing. No. It was a declaration afterwards. And then you also explained in the declaration why he hadn't concluded it earlier. Yes. The state – the declaration was submitted before the final hearing after the master so that it – once he hired counsel, he submitted that additional statement. Okay. Thank you. Thank you. May it please the Court, Kenneth Rosenberg for the Attorney General. Counsel started out by citing a recent decision in this Court which she did not provide  to me. I don't know if she provided to the Court, so I'm in no position to comment on that one way or the other. But more importantly, there was an abundance of evidence here to support the immigration judge's decision that the applicant was not entitled to asylum. There was an awful lot of evidence. She did rely on it quite heavily, the DIJ. And so it does seem to me important to know whether it was acceptable to have this different kinds of evidence from several different people who obviously could have had access to Grind with no opportunity for cross-examination. Well, the first answer to that is there was an abundance of other evidence to support the immigration judge's – Is the question whether this could have influenced the result or whether the result could have come out, could have been substantiated without it? I believe the standard is if there is any evidence – well, no. The standard is that the evidence has to compel a conclusion that the immigration judge was wrong in his fact-finding. In other words, that no reasonable fact-finder could have – If he relied on a big chunk of evidence that we think he shouldn't have relied on, how do we know whether it would have come out the same result? I think that – This is a due process-like claim. It isn't simply – or it is a due process claim. It isn't simply a credibility finding with different inconsistencies. This is a prejudice in the due process context. Well, I think, first of all, the – that evidence was properly admitted, and there was no violation of due process. And then, secondly, that there was plenty of other evidence. And even if the Court were to discount that evidence, the other evidence is sufficient to affirm. But what I'm asking you is – well, first of all, I was asking you to see if you could tell me why there isn't a due process violation. But second of all, I was also asking you if there was a due process violation. Do we simply ask whether there was other evidence, or do we say there was a due process violation which could have affected the outcome, and we're sending it back to do it without the due process violation? My understanding is that you simply ask whether there was enough other evidence. The authority for that. I'm sorry? What is the authority for that? We have cited cases, I believe, in our brief on that. I don't remember the name. There has to be prejudice. But how do you – ordinarily, a harmless error-like standard, if that's what you're talking about, says could this have affected the outcome, not – of the actual decision maker, not simply could he have come to the same conclusion without it. Those are two different things. Well, I can only stand on that I – that I think that there was no due process violation, which I'd like to – Why not? There was none because the report of the State Department was attested to in the manner required by the INS regulations. The Federal rules of evidence do not apply in immigration proceedings. It's a different standard here. But you have a lot of cases saying that there are circumstances in which not presenting a critical witness for cross-examination can be a due process violation. There's a bunch of them. And the question is, why isn't this that circumstance? Well, I don't think that this was a due process violation because it's not – inherent in the nature of the immigration proceeding is that there is no inherent right to cross-examine witnesses. And in this case, as I say, the report was properly authenticated and properly admitted so that there was no due process violation in admitting it or relying on it. Well, counsel, my understanding is under 8 U.S.C. 1229, aliens must be given a reasonable opportunity to cross-examine witnesses presented by the government. Isn't that true? Yes. He had a reasonable opportunity. He could have provided for these witnesses to appear. But he did not. The case law also says that the burden is not on the Petitioner to produce the witnesses, that the government is producing against him. And the government is the one that's producing these witnesses. The government is the one that has to present them for cross-examination. Yes. Well, we did cite at least one case I know that said that it's not the government's burden to produce them for cross-examination. Which cases? I know that we cited a case for that. I think that would be Well, I can't find it right now. And I don't want to – because I have another important point to make about this, which is the report of the State Department investigators stated that she herself went to the office of the Peruvian Air Force official who she was – whose letter was attached as an exhibit, which is the subject of the objection. And she saw with her own eyes that – the problems with the report. For example, there was a police report that was found to be falsified. And she stated in her – the State Department investigations affidavit states that she saw that the numbers were not correct and that it was not signed in duplicate as it needed to be. Well, first of all, she still wasn't available for cross-examination. But second of all, that's only one piece of the evidence. I'm sorry? That's only one of the pieces of evidence that was used against him. That's true. But And there was also evidence about why he was removed from the Army. And there was evidence about – the most important evidence was whether there were threats against him or not. Yes, that's right. The heart of his case is his claim that there were threats against him. And he produced a falsified police report, which the immigration judge said that takes away a lot of his credibility that this police report was falsified. But the judge also found that due to factual discrepancies in the stories, as were alluded to on opening, and a number of other reasons and other inconsistencies in the testimony, as well as the demeanor of the witness, of the applicant, that he was not credible. Did he say anything about the demeanor? Well, he said that the demeanor was one of the factors that he took into account. He did not state specifically when the applicant testified as to this, his demeanor was such and such. That the demeanor was one of the factors. That is on page 58 of the record. The Ninth, starting on 57, he said, The Ninth Circuit teaches an immigration judge that the judge should consider four separate factors when determining a Respondent's credibility. Anything about demeanor being relevant here? Demeanor is in the – is the first word of the third line. And he said that's a factor, but he didn't say that there was any thing about this guy's demeanor that made him not credible. He said that the Respondent's testimony was at times vague and lacking in detail regarding key elements of his case, and his testimony on material issues was largely implausible and unpersuasive. I don't understand that to be demeanor, but go ahead. Okay. There were other problems with the – his story. Can you explain what – the main thing he – other than this falsified document, the other main thing he relied on is that he changed his story, supposedly. Right? That was one, and there were others, too. For example, that his reason for retiring from the Peruvian Air Force, which he said was because of these threats, was rather that for disciplinary reasons, because he had – when he was serving in Chile, he had incurred some debts through his position, and he left without paying them. And the – But that comes out of these non-cross-examined things. Yes, that's true. It did. So I think – And he had an explanation for it, which, frankly, was not all that implausible, but he had an explanation. Yes. He wasn't able to cross-examine the person who told the story in order to see whether that person would agree with his story or not or whether the person could be impeached or not, and essentially he was saying this person had a self-interest, and he wasn't able to – Well, he alleged that the person – he was not on good relations with the person, that the person had a vendetta or whatever against him, but there was no evidence of that. Ordinarily. I mean, in an ordinary hearing, the person would come in and he'd ask him, you know, didn't this happen and didn't that happen, and then the I.J. could determine who was telling the truth and who wasn't, and that didn't happen here. Yes. Well, to – I see my time has expired, but I think to sum up the – there was no violation of due process in the context of this – of an immigration preceding the requirements of due process were satisfied, and the petition should be denied. We do have several cases in which we have said you do – there are due process problems with not being able to cross-examine people. You haven't dealt with those cases in any way. No. I didn't see that the – that they cited any cases that were – that had any – They didn't cite them. They're still there. Okay. Well, I'm not prepared to provoke – to provide further explanation. I guess I expect a little better from the government. Thank you. In terms of dealing with what's out there as opposed to making narrow arguments. Thank you. Counsel, I have a question that I wanted to ask as a matter of interest, and I should have asked before. Can you tell the Court more about the I-130 visa petition that was approved on behalf of the petitioner? Are you planning or have you filed a motion to reopen with the BIA? Yes, Your Honor. His U.S. citizen son, who turned 21, has an approved I-130, and we're waiting for the medical exam to submit the whole package to the government. So, yes. You have filed a motion to reopen his – I didn't understand your answer. No, I'm sorry. I have not filed the motion with the BIA because the adjustment application is still incomplete. At this point, the one piece that it is missing is the medical exam. All right. Thank you. Is there any reason why that's delayed? I mean, that's something your client would have unilateral control over. Yes, Your Honor. I want to move it along. The filing fees are $2,010, and I think that was the delay on my client's part. I would just like to sum up by saying, even if Your Honors are not – are inclined not to overturn the credibility determination, at a minimum, there was insufficient consideration given to his CAT and withholding claims, and for that reason alone, it should be remanded. Under Kalamathas, 2001, and Tahas, 2004, the BIA cannot unduly rely on an adverse credibility determination and fail to consider the relevant country conditions to deny withholding. What evidence is there that Peru is so dangerous for him? So the CAT, I mean, that requires more likely than not, and that would be a stunning result. No, Your Honor. Actually, there's a New York Times article on page – Administrative Record 682, a human rights watch on 799. In the New York Times article, you had a formal – former defense minister who was assassinated by the Senero a long time after he left office. As a matter of fact, in the – in the reports, the country conditions and articles, there's a lot of evidence of former military being assassinated by the Senero. Also, I would just like to mention that I think counsel was referring on the burden of proof. It's on page 22 of his brief, and it's saying, be off – Ashcroft, that the burden of proof is on the alien to prove that he will be persecuted. Also, the immigration judge did not mention demeanor, but on the other four prongs of the Singh-Carr test, which are consistency of testimony, I think I addressed it before when Your Honor asked the question, the plausibility of his testimony. Again, if you go back to the country conditions reports, the New York Times articles, human rights articles, and the international articles, you can see that what he says is very plausible. And as far as the level of specificity, the specificity, once you take into account the supplemental statements in the testimony taken, was very specific as to how the Senero tried to recruit him and the threats that were made. Thank you. Thank you very much, counsel.
judges: D.W. Nelson, Berzon, Clifton